Good morning. Please proceed. If it please the Court, the Commerce Department now interprets 1677.35a and b, which is dumping margins and weighted average dumping margins, to mean that Commerce will include the calculation of negative margins in dumping investigations involving average-to-average comparisons. But it will now zero out negative margins in administrative reviews. And the question that we are raising to you is, is it reasonable under prong two of Chevron? Well, let me ask you though, in this particular case, the investigation was done before the change in policy, correct? Yes. So in this particular case, the investigation used zeroing. Oh, yes. There is no question about that. So don't that make that a little, this maybe not the right case in which to present the argument simply because you've got, if you were to prevail here, we'd be doing administrative investigations under a standard other than the investigation. And doesn't that sort of undermine the argument? The standard of the investigation has nothing to do with it. In other words… Well, I thought your argument with respect to Chevron is that the standard for the investigation has everything to do with it. Well, the standard for the investigation has everything to do with it. And the standard for the investigation changed in December of 2006, and that was the point. In other words, prior to December… Well, I think you're missing, I think you're missing Judge Prost's point. What she's asking is, if the initial investigation is done under one set of rules, and we all agree that was properly done under their then set of rules, why isn't it reasonable for commerce to maintain that set of rules throughout that particular set of, as it relates to that particular importer, let me put it that way, rather than change in midstream. And if they change in midstream, how can they tell which way things are going? Because they're now comparing apples and oranges. Well, with all due respect, the investigation involves a particular set of time, whether it was before the Uruguay Round or after the Uruguay Round, and that sets the order itself. Once the order is set, the administrative reviews are conducted based upon entries during the most recent period of time. The original investigation has absolutely no bearing on how the administrative review is conducted, with the exception of one thing. As long as that, as long as the order, original order, is maintained, then administrative reviews will proceed. Then why is it compelling that commerce apply this same methodology in every case, in an initial investigation and in an administrative review? Well, that is not our argument, Your Honor. Our argument is that the interpretation of the statutory provision of the amount, in other words, do you or do you not include negative margins? All right. Every decision of this court prior to U.S. Steel involved the consistent interpretation of that provision. And that, the Commerce Department said, we're zeroing. And that's the reason we didn't raise this below, because at the time of our briefing, which was prior to their determination in the 123, there was no question. Okay, commerce zeroes. I got it. But as of December 2006, commerce changed its interpretation with respect to this provision of the statute. And at that point in time, the Commerce Department said, well, the amount, when you calculate the amount, we will include the negative margins. And the question is— But they said so. This is the 123 determination you referred to. Right. But they said at the same time that we're not going to engage in zeroing for any other— That's correct. And the question is, is that—the question is, is it permissible, is it a reasonable interpretation of the statute to take diametrically opposed interpretations? This court in both in Timken, Corus, and the line of cases, especially in Corus I, said, well, I understand you're arguing that zeroing doesn't apply to investigations, and you're arguing that because if it did, you know, you're saying that Timken doesn't apply, because you have an investigation and that was a review. Yeah, and you're arguing that because if Timken applies, you're out of court. And what this court said is, actually, the distinction between investigations and reviews does not apply with respect to the definition of 1677 and 35. And therefore, Timken governs. This court didn't do a separate Chevron analysis in Corus I. And this is exactly the decision that was upheld recently in U.S. Steel. This is the position that was taken by the court. The court said, that was our analysis. Our analysis is that the issue of zeroing is raised only in this one provision in 1677. And what we're suggesting to this court is that the Supreme Court's decision in Clark v. Martinez, in which the court said, look, if you've got one provision, one single provision, that may have different policy aspects to it, it must be interpreted consistently, because to do otherwise is to invent the statute and not interpret one. That's basically our position. Clark is clearly a problem for the government. When the government gets up, I'm sure we'll be talking about it. But why can't the government hold two inconsistent ideas in their heads at the same time? They do that all the time. They do that all the time. I do that all the time, or at least my colleagues claim it. Now, I have a defense that maybe the government doesn't have, which is, my answer is, no law requires me to be reasonable. Right. I take it under Chevron there's some sort of reasonableness standard that they have to live up to. But why is it unreasonable to hold two opposing ideas simultaneously? It is not unreasonable to hold two opposing ideas simultaneously if it isn't the same provision. But what this court said in SKF, for instance, was, okay, we've got one term. Now, it applies in different sections of the statute. And what you said is, look, the reasonability standard is not unbounded. Your discretion is not absolute. And what the Commerce Department is saying is, look, in Timken, you said that it was reasonable, that it was my discretion, and I could zero or not zero. And they are taking the position that that basically continues throughout time. It never changes, no matter whether or not there has been an intervening change in the underlying statutory interpretation. They went through notice and comment on the 123 determination. They went through notice and comment, and they said, look, we are changing our interpretation with respect to this provision. What provision? It is exactly the provision that we're talking about, 1677.30.35. Mr. Kerry, is there any explanation anywhere in the record, either in the 123 determination or in any other place in this record that sets out some explanation by Commerce as to why they might treat these zeroing differently in an initial investigation and in an administrative review? No, there is not. And what we would suggest to your honors is, yes, we have asked for a remand. Now, it is proper in a remand to give them a chance to give that explanation. But what we are suggesting is that given the statutory construction that has consistently been maintained by this court since Chorus I, which is we are dealing with a single provision, this single provision applies to investigations and to administrative reviews. But in fairness, those different reviews conducted at different times don't necessarily apply the statute in the same way. The initial investigation is an average to average comparison. Later on, it's an average to transactional comparison. That's correct. So isn't there already built into the system a different examination of different things at different times, even though it's all under the same statute? Fair enough. Fair enough. And that is exactly what was argued in Chorus I. Precisely. That was exactly the argument that was given. They said, look what we do in reviews. And you have done the analysis of reviews in Chevron Reasonability. But in investigations, it's very different. We only do average to average comparisons. Wait. The argument in Chorus by who? Not by the government. No. That was the argument made by the appellant in that case in order to distinguish Chorus and say you shouldn't be able to zero in investigations even though you do in reviews. Why can't the government say hypothetically, hey, we've maintained that zeroing is required. We've always maintained that consistently. But now we're forced by other circumstances, by other policy considerations to go the other way, a circumstance in which we have little control. So therefore, it is reasonable that we maintain the position we've adhered to throughout with the exception of those instances where we're forced by other reasons over which we have no control. Why isn't that a reasonable position to take? Well, I think that that is exactly the position that was taken in Clark v. Martinez, in which it was said, wait a second, the category two aliens, that was based on constitutional questions. But that's kind of different. That's a different issue. Well, the issue that was presented there was different policy considerations for a single operational language that applies in the statute. And this court has held, repeatedly, that we're talking about single operational language, which is the language of 1677. And so is it reasonable? And what we would suggest to you is that we go ahead, let's explain it. But it's very difficult to understand and be consistent with Clark v. Martinez to see how it could be reasonable to maintain that. And yes, there are different mechanisms. But those different mechanisms were explicitly for reviews and investigations, Your Honor. I apologize. But you're suggesting this case isn't right for that review. We should remand it and allow them an opportunity. Well, you have to remand it. We're suggesting, if you were to agree with us, that you have to remand it. But we are suggesting it would be with direction. If it please the Court. Well, you're into your rebuttal. You're free to use it. I would like to leave it for rebuttal. I apologize, Your Honor. No apology necessary. And Ms. Burke, good morning. Good morning. It please the Court. The issue as presented by union here is whether it's reasonable for Commerce to not use zeroing in investigations but continue to use zeroing in administrative reviews. And that is the precise issue that was addressed by this Court in what we refer to as Chorus 2 in our briefs. It's the issue. Okay, counsel, let's not spend a lot of time on that. The dicta in Chorus 2 is not controlling. So get that out of your mind. Okay. Deal with the issues that we're trying to get you to focus on, which is what is the rationale? What is the policy explanation for how you can hold two inconsistent positions in your head or, more importantly, in your rules at the same time and claim that that's reasonable? This is, again, I won't bring up Chorus 2, but this is the issue that was raised in the most recent Chorus case that was before this Court, and it's the same issue that was raised in U.S. Steel, in which Commerce changed its interpretation and that change of interpretation was held by this Court to be reasonable. But that's a different question. And U.S. Steel didn't really address the question before us. That's a question we were wrestling with, and that is how can there be a different interpretation of 1677 paragraph 35 in an initial investigation compared with an administrative review? Well, it's hard to talk about that question without talking about U.S. Steel. What Commerce has done in this administrative review is do exactly what it has done in each administrative review that's been before this Court with respect to zeroing. So its explanation of why it continues to use zeroing in administrative reviews, had it had the chance to give its explanation in the final results, would have looked exactly the same as it has. Well, I understand, and we have held in case after case that the statute is ambiguous. Therefore, Chevron deference applies to the agency's interpretation of that statute, and the agency is free to provide an explanation. And indeed, we have found that the explanation has been reasonable, both in an initial determination and an administrative review. But we've never confronted the question of whether Commerce can take this different, quote-unquote, reasonable interpretation in the same case under the same statute at different times, in an initial proceeding and an administrative review. There is something inherently inconsistent with that, is there not? Well, no. And in fact, that is exactly the question that the Court took up in the most recent Corris decision in which the Court did not issue a published opinion. That's exactly the same issue that was before the Court previously, and it was in the exact same procedural posture where— Well, we're obviously not compelled by it. That was a Rule 36 case, was it not? That's correct. All right. So that doesn't bind us here. That's correct. So again, where's the explanation? That's what I'm looking for. Where's the rationale for taking these different views? Well, there's no rationale in Commerce's final results, and that's because of the procedural way in which this issue was raised. So I think as both parties— in a calculation process, that is, for the initial investigation. And then when you come back later in time to evaluate exactly the same set of questions, is this particular importer selling below fair market here versus there, and do we zero or do we not zero using the exact same statute? What is the rationale for being able to zero in one case and not zero in the other? That's what we're trying to understand. What is your theory behind that other than the suggestion you were forced to do it in the one case and you don't want to do it? Is that the bottom line? I wouldn't put it exactly that way, but—and again, I'm going to have to talk about U.S. Steel. What we explain to the Court in our briefs and in our presentation in U.S. Steel is the reason why Commerce changed its methodology with respect to investigations was to come into compliance with our obligations at the WTO. That was the reason. Okay. There was no additional reason. So is the government's position that that is a sound legal basis for saying that we can have the same statutory language and apply it in one way in one respect and another way in another respect and that that satisfies? Well, respectfully, we don't view it as just our position. We view it as the Court's position because the Court held in U.S. Steel that the change in methodology for investigations— Well, can we just ask you—I mean, I accept what you've said. I think you've said it now three times. We'll accept your interpretation of those cases, but let's leave those on the side. Let's go back to the heart of the issue. Is it the government's position that it is reasonable for the government to take a different position with respect to zeroing, with respect to administrative reviews, and a different one with investigations? And if so, why? Okay. The first answer is yes, we do think it's reasonable. And the answer why, with respect to zeroing, is the following. The reason why Commerce continues to use zeroing in administrative reviews is the same reason that it is always given. Taken to its logical—taking Union's argument to its logical extension, the only way that the Court could find that Commerce's zeroing methodology in reviews is not reasonable is to find that it should be doing what it's doing for investigations. But the only reason— Right, because the statutory basis for both is the same. Right. And is that not correct? The statutory definition is the same. But if the Court determines that Commerce's use of zeroing in administrative reviews is now unreasonable, then what's the reason? No, we're not arguing—nobody is asking whether that's unreasonable for you to continue to zero. The question is not whether it's unreasonable for you to continue to zero, because we've long said it was reasonable for you to do that. The question we're now asking is, well, if you've changed your mind, and you don't want to zero anymore, and we've said, well, okay, that's a reasonable position too, the question is, can you hold both of those as reasonable simultaneously? Right. And the answer that looms large in front of anybody who looks at that is, how can you do that? Well, the answer is yes. There's nothing that prevents Commerce from interpreting the same definitional provision differently for different purposes. I mean, that's exactly what Chevron was about. And it's also— other than saying one is for an administrative review and the other is for an initial investigation, when the two purposes are exactly the same in the APTCHA, which is to test whether all of these transactions add up to a duty. What is the different purpose of Commerce? And its 123 determination for investigations was to come into compliance with an adverse WTO report. And that is exactly what— It comes back to that. It comes back to that. And that's what is contemplated by the statute. The statute specifically contemplates that this precise event can happen. Are you basically saying, then, that zeroing—that the decision not to zero is unreasonable except for the fact that you were forced to do it? No. That's not what we're saying. What we're saying is the reason that Commerce gave as to why it's reasonable is that Commerce was complying with Section 123 and 129 of the statute and changed its determination based upon the political branch's decision to implement an adverse WTO report. That was the reason. And forgive me for bringing it up maybe a fourth or fifth time, but that reason was held reasonable by the court. Yeah, that it can change its position with respect to investigations. You recall—I don't know if you were the person that argued Corus, but we had Corus I. I'm talking about Corus I. The original—I was not. But the government did make the argument, did it not, that we should follow Timken, that Timken, in essence, was dispositive because there's no difference, because we're talking about the same statutory provisions. And the government's—Commerce's interpretation of the same statutory provisions means that there's really no distinction between Timken and Corus. So do you recall that that was the government's view in that case? It was the government's view. How does that analysis hold up under the circumstances here? Well, I'd like to put that into a little bit of context. The issue in Corus I, as presented by Corus, was whether zeroing was prohibited as a matter of Chevron I by the statute. So we already had Timken, and we knew that we were in Chevron II territory in Timken, but Corus presented the issue to the court as, this is totally different. This is a Chevron I issue. It's prohibited on the face of the statute. And what we said, and what I think the court agreed with, is that, no, this is still a Chevron II issue. So Timken binds the court for that purpose. And, yes, at the time, since we were doing it the same way, we argued that we have the same reason, so it's obviously reasonable. But you're saying it's reasonable for Commerce to take the exact same statutory provisions in circumstances which the government has long argued are essentially the same, and to interpret those statutory provisions in one respect with regard to investigations and in another respect with regard to administrative reviews. Well, again, I think that we acknowledged that the interpretation was the same for the different procedures. I don't think that we acknowledge that investigations and reviews are identical. And I don't even think the court held that in Corus. But it's the first acknowledgment that Judge Prost says applies to this case as well as to Corus I. I mean, you said in your brief in Corus I there was no provision in the statute for applying the definitions of dumping margin and weighted average dumping margin differently in an investigation and in a review. You were arguing that those, the same statute, ought to be interpreted in the same way with respect to reviews. Yes, we were. Have you changed your position? We have not. We have not changed our position for reviews. We have obviously changed our position for investigations. And your argument is that they should not be treated the same. I'm sorry. Yeah, the argument is that they should not be treated the same because of the government's compliance with the WTO actions. That's correct. So that's the rationale, that it's the same statute, it's the same provision, it's the same issue to be determined in both initial investigations and administrative reviews, but the government's hands were tied by the WTO with respect to the initial investigation. That's the explanation. Well, I wouldn't say that the government considers its hands were tied, but the government made the determination to implement the decision, and the result of that decision is a different interpretation. And your position is that that's a reasonable interpretation of the statute, even though it was encouraged by the WTO, if not demanded. But in any event, what you came to in response to the WTO is a reasonable interpretation under Chevron. Right. That's the government's position. So you have to say your position is it's a reasonable interpretation of the statute to not apply zeroing in investigations. It's a reasonable interpretation of the statute to apply zeroing in administrative reviews, and it's a reasonable interpretation to take the same statute and apply it differently in those two different circumstances. That's correct. I think that the main case that your opponent is relying on is this Clark case, and I do recall that they cited that in gray and not blue, so I don't think you responded to that. Do you have a response today? And secondly, do you have any cases you can give us? Because I don't think you cited any cases in red other than cases you've talked about here, our cases. What's your best support for allowing the government to take that position? First, with respect to Clark, we think that Clark doesn't apply to this situation at all. Clark involved a judicial interpretation of a statutory provision regarding indefinite detention of prisoners. It involved a constitutional question. It was not a Chevron question in which the court is obligated to defer to an agency's interpretation. So long as it's reasonable. So long as it's reasonable, yes. So I just don't see how it's applicable at all. With respect to our best case, I would say, and I think we cited it in our brief, I think that this Court's decision in SKF and the Supreme Court's decision in Chevron are best cases. The Court's decision in SKF said that commerce can interpret foreign-like products. It didn't say that it can't interpret it differently for different purposes. What it said is what you've done, commerce, is not provide a reasonable enough explanation. Go back and do that. Commerce went back and did that, and then commerce's multiple interpretations were sustained. So I don't see how SKF harms us at all. In fact, I think it helps us, as does Chevron, which, again, involves an agency. Ultimately, the agency was taking a universal view of the particular definition at issue. But along the way, the point was that the agency had taken different interpretations, had different interpretations of a statutory provision, and then took a universal view, and that universal view was challenged. So really this is no different from Chevron in our view. Can I just ask one more question? The other side, you didn't make this argument. I'm wondering now if you're prepared to embrace it, which is that this isn't quite the right case on the facts to resolve this issue because in this particular case the investigation was done under the previous zeroing policy. I ask that of the other side. The government never made that argument. Do you think it has any power? Well, I think the issue has come up kind of maybe in the reverse in some of the KORUS cases where, and maybe not yet, where in the initial investigation Commerce used zeroing and then revoked the order. So, I mean, I think it's kind of a different side of the same coin. I don't think it makes a difference whether Commerce is using the same or different methodologies in the same proceeding. In fact, the SAA talks about the fact that the 123 and 129 process can lead to that very result, which is Commerce using one kind of methodology in one segment of the proceeding and then changing it to come into compliance with the WTO report, and then you have two different, you're trying to hold two concepts at the same time in the same proceeding. So I don't think it matters. All right. Judge Plager has a question and then we'll hear from U.S. Steel. Judge Prost and I are chasing squirrels on the same hill, which is the timing question. Think of it this way. If we were to grandfather in, well, let me back up even one step beyond that. Let's assume that I cannot hold in my mind two different ideas simultaneously when one is a yes and one is a no, and I don't think the government can either when it comes to interpreting this statute. So I say to myself, is there any way the government could otherwise win in an argument like this if they can't justify having two different interpretations? And one way to get there would be to say, well, maybe these people are, you're grandfathered in in terms of the zeroing practice because, and then we could ask, because the initial investigation started under the old rule or because the final, what is it called, the final order, the end of the administrative review ends in a final order. Isn't that what it's called? The final results. Final results. One could say if the initial investigation is under one regime, then all the later investigations should stay under that, even if you've changed your policy under 123 determination. Or you could say only if the final results come down before the new policy comes into effect. Now, in their case, their final determination came down a month after, but everything else had preceded. Does the government think any of those grandfathering concepts have relevance or do you want to stand on the earlier position that we finally interpreted you to be in? Did I make any sense in that question? If I'm understanding the question, I don't think that this grandfathering principle would make any difference, and I think the reason is that the way that, at least with respect to changing methodologies in response to the WTO, I'm not talking about changing methodologies for some other reasons, but with respect to this issue, commerce is balanced by the statute and implementations of changes have a precise way, a precise manner in which they can be effectuated. And each thing stands on itself, even though it's the same importer. Over time, each investigation, whether it's initial or a subsequent review, there are independent effects. There are independent effects. They have particular effective dates that go respectively. You agree with counsel on the other side on that issue? Maybe. I'd be hesitant to say that. All right. Very good on that. Now let's hear from U.S. Steel. And we've pretty much chewed up the clock with our questions, but we'll give you three minutes and proceed from there. All right. Thank you, Your Honor. We approach this very differently, and I'd like the Court's indulgence. We think there is only one interpretation of Sections 35A and B, and that interpretation is that the statute, in its plain language, requires the Commerce Department to use zeroing in this case and every case. And I am going to go through this quickly. So you would agree at least with the tone of the questions here, which is it's unreasonable for them to apply a no-zeroing policy in one respect and a zeroing policy in another. Well, we think it's unreasonable and unlawful to not apply zeroing in any case. But have we crossed that bridge? Well, I think in U.S. Steel, in that decision, yes, but it's not a final decision petition. No, no, no, but in Timken, didn't we decide? I mean, the government pressed in Timken that zeroing was compelled. We rejected that, and I think they even went up for cert on that and other grounds, and we said, no, no, no, no, no. It's ambiguous. It's subject to reasonableness. Timken, as part of the petitions for rehearing, the validity of Timken on an ongoing basis has been called into question, and the Court has been asked to take a second look at that. Yeah, but until we do that, I mean, we were asked to take a second look at virtually everything we do, but unless and until we do that, we're still bombarded. So assume Timken resolved that issue. I can't, Your Honor, because there are three provisions in the statute, one right after the other, that in their plain language, without any question, compel zeroing to be used. All right. We take your position. Let me ask you another question. I would like to go through that there is any basis for taking the same provisions in the statute that are applicable, the dumping margin, those terms that are applicable to investigations and also to administrative reviews. Is there any basis for applying a different interpretation to those statutory terms in different contexts? Is there any legal or policy basis? Well, I think it's very clear that the position of the government is that— I'm not asking for their position. I'm asking for your position. We've already— Well, our position is that they must zero all the time, so that because the— But answer my question. But we all know what statute we're looking at. Is it just your legal view that you could forget zeroing or whatever, that you can apply those same statutory provisions differently in the administrative review? Yes. If you say that this is a permissive statute, that this particular section of the statute gives the agency latitude to choose, and if the agency had a reasoned basis, then yes, they could take different positions. But I think Judge Proulx's question is not whether it's permissive and Congress can take different positions. The question is can they take different positions at different phases of the same proceeding at the initial investigation and the administrative review? Well, they could do that if they had a reasoned basis, and their basis is that they are implementing a WTO decision from the— And in your view, is that a sufficient reasoned basis under the case law? In our view, you're—based on what the Court has said, definitely zeroing is reasonable in the administrative review so that they could certainly continue to engage in zeroing. But may I ask— But not zeroing, but to do not zeroing in one and zeroing in the other. Is that what they could do? Well, if I—yes, I understand, and, you know, if pressed, obviously we think that they could do—they could abandon zeroing in investigations but continue to zero in administrative reviews, definitely. But I would like to demonstrate to you how the plain language of the statute requires the Department to engage in zeroing in every case. And I could do it very quickly. Well, I think your point is well taken, and I think we need to move on. I thank you very much, and let's hear from Mr. Cameron on rebuttal. Your Honor, thank you very much. We've got three minutes, but if you need a little bit more time, given the fact that we gave the other side a little more time, that's fine too, but— I'll try and keep it brief. Very good. Well, the Court clearly understands the issue, and that's actually all we're asking for. It was suggested by counsel for the government that the statute contemplates— I mean, and they said this in their brief as well— contemplates inconsistent interpretations. I would like to ask this Court two things. Number one, is there a shred of authority that was cited for that proposition? The answer to that, by the way, is no. The second thing is that if this Court is interested in what inconsistent interpretations are contemplated with respect to implementation, that is with respect to 129 determinations. There is no mention of this under Section 123, nothing in legislative history, nothing in the SAA. What the SAA refers to, starting at pages 102-2 of the SAA dealing with 129, is they're talking about the mechanism to enable agencies to draft a second determination where appropriate. In other words, you had a determination, a review determination, an ITC determination, and it was overturned at the WTO. They asked, can we make a determination that will be consistent with the WTO, even though it would be inconsistent with our underlying determination, and our underlying determination might be on appeal? And this is all addressed in the SAA, and the statute provides for that. That is not what 123 is about. 123 is about regulations. This is about statutory interpretation. There is no shred of authority to support the idea that 123 supports or contemplates inconsistent determination. Secondly, Clark v. Martinez. You were asking for a distinction between Clark v. Martinez. The government said, well, that was Chevron, and this is not Chevron. That was not Chevron. This is Chevron, and therefore Clark v. Martinez doesn't have any relevance whatsoever. What we would suggest to you is that, yes, we understand it's not binding authority, but we do believe it is persuasive, and we believe it's persuasive on, frankly, if we were here before on zeroing, if this was some other topic, our proposition would not even be debated here. The only reason that anything is controversial is I've got 20 cases against me on zeroing, and everybody is saying, what are you doing here? But in Clark v. Martinez, what the court said is, we can't, this is an ambiguous statute. This is an ambiguous statute. And you can interpret the statute, the operative language. But once you interpret the operative language, and this does get to your question, Your Honor, I believe, in that case, I grant you, it was a constitutional question for the initial determination in Zabdos. But the court said, look, I mean, we are bound by that determination with respect to the other classification of aliens, because there's three classifications of aliens that are involved in this provision, and that operative language applies equally to all. Okay, that's fine. That's what that case stands for. Well, when Clark says to interpret the statute any differently, the operative language any differently, would be to invent a statute, not interpret it, that's another way of saying it's not reasonable. So the idea that it's not a Chevron case does not really answer the question. Finally, the WTO, this is a statutory interpretation. They weren't forced to do this. We've already heard, you've got legions of cases in which the government has said, and we know this for a fact, that the decision to comply with the WTO is a discretionary function of the government. The government decides, well, okay, I'm going to do this. They made, in doing so, an interpretation of the statute. They interpreted 1677. All we are saying is that once the government, through notice and comment, made its determination, they did it because as a result of the WTO decision, they could have done it for any reason. They could have woken up one day and said, you know, we're changing our interpretation because of various policy reasons, and therefore we're changing our interpretation. Do notice and comment. They could have done that. WTO happens to be there, but they could have done that in any case because it was a permissible interpretation of the statute. But once they took that permissible interpretation of the statute, it had legal consequences. And that legal consequence is, in this case, it is a single statutory provision that applies with equal force, according to this court in chorus, and I suggest to you in U.S. Steel, with equal force to investigations and reviews. And as a result, the legal interpretation has to be consistent one way or the other. You don't want a zero, then don't zero. You want a zero, don't zero. Zero, I don't care, but it's got to be consistent. And that's the point. All right. Your Honor, we see zero. Thank you very much. We appreciate your time. Thank you very much. Thank you.